IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| BENNIE MAE SNEAD,<br><br>Plaintiffs,<br><br>vs.<br><br>GEORGIA DEPARTMENT OF CORRECTIONS, *et al.*,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>* | CASE NO. 4:23-CV-153 (CDL) |

O R D E R

Bennie Mae Snead's brother Curtis Mincey was beaten to death while he was incarcerated at Rutledge State Prison. When Plaintiff originally filed this action, she did not know who beat her brother to death or whether any prison officials contributed to his death because prison officials refused to disclose any information about Mincey's death to Plaintiff. Although the Court dismissed several of Plaintiff's claims because she did not allege an adequate factual basis for them, the Court permitted discovery on her remaining claims. *Snead v. Ga. Dep't of Corr.*, No. 4:23-CV-153 (CDL), 2024 WL 4608573, at *3-*5 (M.D. Ga. Oct. 29, 2024).

During discovery, Plaintiff learned that her brother was beaten to death by his cellmate while the corrections officer who was supposed to be monitoring them slept at her desk. The Court permitted Plaintiff to amend her complaint to add claims

against Corrections Officer Denet Bryant, Shift Supervisor Justin Mock, and Warden Deshawn Jones. *See* Order on Mot. for Leave to Amend (Jan. 28, 2026), ECF No. 55. The Court denied Plaintiff leave to add claims against the Georgia Department of Corrections ("GDC"). *Id.* at 10-11.

Plaintiff filed an amended complaint, asserting claims against GDC, Bryant, Mock, and Jones. Bryant filed a motion for summary judgment (ECF No. 65). GDC, Jones, and Mock filed a motion to dismiss (ECF No. 66). After Defendants moved to dismiss the amended complaint, Plaintiff acknowledged that her 42 U.S.C. § 1983 claims against GDC must be dismissed because the GDC is not a "person" within the meaning of § 1983. Plaintiff also conceded that her state law claims against all Defendants should be dismissed because they are barred under the Georgia Tort Claims Act. Accordingly, Plaintiff's § 1983 claims against GDC are dismissed, as are all her state law claims. Plaintiff argues that her remaining § 1983 claims against Jones, Mock, and Bryant should not be dismissed, and she sought leave to file a second amended complaint to clarify her claims. As explained below, the Court denies Bryant's summary judgment motion (ECF No. 65), grants Jones and Mock's motion to dismiss (ECF No. 66), and denies Plaintiff's motion for leave to file a second amended complaint (ECF No. 68).

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the present record reveals the following facts.[1]

Curtis Mincey was an inmate at Rutledge State Prison, which is operated by GDC. During the timeframe relevant to this action, Deshawn Jones was the prison's warden, Denet Bryant was a corrections officer, and Justin Mock was a lieutenant who served as a shift supervisor. Mincey entered Rutledge as an inmate on September 22, 2020. He was seventy-four years old and hard of hearing. Am. Compl. ¶ 21, ECF No. 57. On June 23, 2021, Mincey was moved to the prison's G Dorm, the administrative segregation dorm. *Id.* ¶ 22. His cellmate was Joshua Starks, a thirty-year-old inmate. *Id.* Inmates are assigned to G Dorm if they violate prison rules or behave in a way that could cause injury to themselves, other inmates, or prison staff. *Id.* ¶ 32. G Dorm inmates "require constant security and must be observed at a minimum interval of thirty (30) minutes." *Id.* Correctional officers assigned to G Dorm are

[1] In their briefing, the parties relied chiefly on the allegations in the complaint. Defendants acknowledge that at the motion to dismiss stage, the complaint's factual allegations must be accepted as true. In support of her motion, Bryant relies on the allegations in the complaint and on evidence outside the pleadings. She recognizes that if the Court considers matters outside the pleadings, it should consider her motion to be for summary judgment, with the cited evidence viewed in the light most favorable to Plaintiff. Accordingly, for purposes of the present motions, the Court recites the facts as alleged in the amended complaint and, where appropriate, the facts established by the parties' citations to the evidence, viewed in the light most favorable to Plaintiff.

supposed to document their observations regularly. *Id.* ¶ 33. They are not allowed to skip their rounds, make false observation log entries, or sleep while on duty. *Id.* Correctional officers assigned to G Dorm should be "selected carefully and regularly evaluated by the supervisory personnel," and they are required to undergo specialized training. *Id.* ¶ 34. Although Bryant was regularly assigned to G Dorm, she never received any specialized training for her G Dorm duties. *Id.* ¶ 35. Bryant was familiar with Mincey and Starks. Mincey often tapped on his cell window and tried to talk with Bryant, but she found it hard to understand him. Starks was always very quiet.

On July 21, 2021, Bryant and Mock were scheduled for a twelve-hour overnight shift at Rutledge, along with a new correctional sergeant named Adrian West. Bryant suffered from cluster migraines that make her sensitive to light and loud sounds. *Id.* ¶ 42. Bryant frequently wore dark sunglasses at work, even at nighttime, and she often wore ear plugs. *Id.* Mock knew about Bryant's migraines and had seen her wearing sunglasses and ear plugs while at Rutledge. On July 21, 2021, Bryant "was experiencing cluster migraines and was not fit for duty" or "was not mentally and physically capable of performing her security duties." *Id.* ¶ 43. Mock, who "knew or should have known that" Bryant was not fit for duty on July 21, 2021, nonetheless assigned Bryant to work in G Dorm alone even though

G Dorm should have had two officers assigned to it. *Id.* ¶¶ 93, 138. Because the prison was understaffed, several other officers were assigned to multiple posts. *Id.* ¶ 45.

While working in G Dorm, Bryant was required to make cell checks every thirty minutes. *Id.* ¶ 57. Shortly after her shift began at 6:00 PM, Bryant felt "the ill effects of the cluster migraines." *Id.* ¶ 47. Neither side pointed to allegations or evidence that Bryant notified her supervisors that she was ill. Bryant "started skipping observation rounds" but made "multiple false entries so that the checklist would appear that she had made rounds timely." *Id.* Bryant was required to make notations of "all tasks completed and any unusual activities" in a logbook. *Id.* ¶ 48. West, the assistant shift supervisor, made a logbook entry stating that at 9:50 PM, all doors and locks were secure, and all offenders were alive and well. *Id.* He "apparently did not notice" that Bryant had failed to make timely entries in the logbook regarding her completed tasks for the previous two hours. *Id.* After West's 9:50 PM entry, Bryant made several entries in the logbook, starting at 7:30 PM. *Id.* Plaintiff alleges that shift supervisors like Mock were required to escort senior officers "during post checks" and to make "appropriate logbook notations" but they "customarily ignored" those requirements. *Id.* ¶ 56. On July 21, 2021, Mock only made

six entries in the supervisor's logbook, the last at 9:55 PM. *Id.*

Bryant contends that she conducted a lockdown count at 11:30 PM, but she does not know when she conducted her cell checks. Bryant's Mot. Summ. J. Ex. 1, Audio Recording of Bryant Interview 00:01:06 - 00:01:20 (July 22, 2021) (on file with Court as GDC 000203) (hereinafter Bryant Interview). Bryant hoped that a camera would capture her cell checks to establish the times. Bryant Dep. 137:11-24, ECF No. 50. It was "extremely dark in the cells," so officers are supposed to "turn on the cell lights or use a flashlight to see the occupants" of the cell. Am. Compl. ¶ 49. When Bryant did her cell checks, though, she did not turn the lights on or use a flashlight to observe Mincey or the other inmates. *Id.* She assumed that Mincey was asleep during the 11:30 PM lockdown count because she did not see him at the cell door window, and he is normally asleep for the lockdown count. *Id.*

After the 11:30 PM count, Bryant went to the prison's security office to turn in her count documentation, then she returned to her post in G Dorm to catch up on the logbook. *Id.* ¶ 50. She rested her head in her hands and fell asleep. *Id.* While Bryant was in and out of sleep, she heard Mincey banging on the door of his cell and "fussing" at his roommate, and he sounded "angry." Bryant Interview 00:09:31-00:09:41. Bryant

stated that G Dorm was normally "really loud" but was "so quiet" on July 21, 2021 because an inmate who usually made a lot of noise was "knocked out asleep," so Bryant just heard banging and angry fussing from Mincey. *Id.* 00:10:21-00:10:51. Bryant did nothing to investigate and went back to sleep.

At 1:48 AM on July 22, 2021, West went to G Dorm to conduct post checks. Am. Compl. ¶ 51. When West got to the first cell and reviewed the chart, he could not understand Bryant's handwriting, so he took the chart to the officer's station. *Id.* When West arrived at the officer's station, the door was locked and closed, so West slapped the door with his hand twice. *Id.* ¶ 52. Bryant woke up when West slapped the door, and she admitted that she had not made any proper cell checks since around 11:00 PM. *Id.* West then went to check the cell of Mincey and Starks. *Id.* ¶ 53. When he turned on the light, West saw Mincey on the floor face up, with dried blood all over his face. *Id.* West immediately contacted Mock on his radio and told him to call 911. *Id.* Mincey had no pulse and was cold and stiff to touch, and there were foreign objects stuffed in his mouth. *Id.* ¶ 54. Officers attempted to perform CPR on Mincey until paramedics arrived and confirmed that he was dead shortly after 2:00 AM. *Id.* ¶ 55. A deputy warden contacted Plaintiff around 8:00 AM on July 22, 2021 to inform her that Mincey had died. *Id.* ¶ 58. The deputy warden told Plaintiff that Jones would contact

her to provide more information, but he never did. *Id.* ¶¶ 58-59. Instead, he "failed or refused to speak to Plaintiff" about the "particulars surrounding Mincey's death." *Id.* ¶ 59. Following an autopsy, the Georgia Bureau of Investigation ruled that Mincey's cause of death was homicide caused by blunt force trauma. *Id.* ¶ 60. Starks pleaded guilty to Mincey's murder on April 16, 2024.

Plaintiff asserts the following claims:

- ♦ Count One: Section 1983 claim against Bryant for violations of Mincey's Eighth Amendment rights.
- ♦ Counts Two and Four: Section 1983 claims against Bryant for violation of Mincey's Eighth Amendment rights.[2]
- ♦ Counts Five and Six: Section 1983 claims against Jones, and Mock for violation of Mincey's Eighth Amendment rights.

In the amended complaint, Plaintiff invokes the Fourth Amendment as the basis for Counts Two, Four, Five, and Six. Plaintiff asserts in her response brief and her motion for leave to amend that this was a scrivener's error and that the claims are substantive due process claims under the Fourteenth Amendment. Plaintiff also references *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) in Counts Five and Six. Both of those cases explain when a municipality may be held liable for constitutional violations resulting from its employee's actions.

[2] There is no Count Three.

Plaintiff now concedes that she does not assert a municipal liability claim and that it was an error to reference *Monell* and *Canton*.

The Court finds that Plaintiff's Fourteenth Amendment substantive due process claims are properly analyzed under the Eighth Amendment. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (noting that when a constitutional provision "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [those] claims") (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)); *accord Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

Based on her § 1983 Eighth Amendment claims, Plaintiff seeks wrongful death damages, damages for Mincey's pre-death pain and suffering, punitive damages, and attorney's fees.

DISCUSSION

## I. Bryant's Summary Judgment Motion

Bryant seeks summary judgment on the § 1983 Eighth Amendment claims against her, claiming that she is entitled to

qualified immunity. "Qualified immunity shields government employees from suit in their individual capacities for discretionary actions" unless those actions violate clearly established law. *Brooks v. Miller*, 78 F.4th 1267, 1279-80 (11th Cir. 2023). Here, Bryant was performing the function of supervising prisoners—a function that was within her legitimate job description but for the alleged constitutional infirmity of her falling asleep in the middle of her shift and ignoring the noise coming from Mincey's cell. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004) (explaining discretionary function). Thus, Plaintiff must show that the officers violated a clearly established constitutional right. *Brooks*, 78 F.4th at 1280.

To establish a § 1983 claim for an Eighth Amendment violation, a plaintiff must present enough facts for a reasonable jury to find that a prison official was deliberately indifferent to a known, substantial risk of serious harm to the inmate. *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024).[3] The first element of such a claim is a "strong likelihood" of "grievous injury." *Id.* (quoting *Brown v. Hughes*,

[3] *Nelson* involved the risk of harm to a pretrial detainee, and the Fourteenth Amendment is the source of a pretrial detainee's right to be free of deliberate indifference to a substantial risk of harm. The standards for deliberate indifference under the Fourteenth Amendment are the same as the standards for deliberate indifference under the Eighth Amendment, so the courts apply Fourteenth Amendment deliberate indifference case law to Eighth Amendment cases and vice versa. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013).

894 F.2d 1533, 1537 (11th Cir. 1990)). The next element is that the officer "actually (subjectively) knew" of the risk to the inmate and disregarded it by failing to respond to it in an objectively reasonable manner. *Id.* at 1297 (quoting *Mosley v. Zachery*, 966 F.3d 1265, 1270-71 (11th Cir. 2020)). To show deliberate indifference to a substantial risk of serious harm, a "plaintiff must demonstrate that the defendant was actually aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade v. McDade*, 106 F.4th 1251, 1261 (11th Cir. 2024) (en banc).

It has long been clearly established that prison officials must take reasonable measures to guarantee the safety of other inmates, and a prison official violates the Eighth Amendment if she knows that an inmate faces a substantial risk of serious harm and "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Here, there is no dispute that Mincey was in serious danger during the altercation with Starks on the night of July 21, 2021. Bryant contends that there is no evidence to create a genuine fact dispute on whether she knew about the altercation. But there is. Again, at this stage in the litigation, the evidence must be viewed in the light most favorable to Plaintiff, and all reasonable inferences must be drawn in her favor. In that light, the evidence would permit a reasonable

juror to conclude that G Dorm was unusually quiet but that Mincey, who typically tapped on his cell door and tried to talk with Bryant, began banging on his cell door and fussing angrily after Bryant believed he had gone to sleep for the night. It is undisputed that Bryant, despite being asleep in her office with the door shut and her earplugs in, heard that Mincey had been awakened and was fussing angrily while banging on his cell door. Based on this evidence, viewed in the light most favorable to Plaintiff, a reasonable juror could find that Bryant knew there was a high probability of an altercation in Mincey's cell but chose to ignore it. Accordingly, Bryant is not entitled to qualified immunity on Plaintiff's Eighth Amendment claim.

Bryant argues that even if Plaintiff may proceed on her § 1983 claim, she may not recover wrongful death damages under Georgia law because her claim is time-barred. There is no dispute that Georgia's two-year statute of limitations applicable to personal injury claims applies to Plaintiff's § 1983 claims. Bryant argues that the statute of limitations accrued on July 22, 2021—the day Mincey died.[4] The statute of limitations for a § 1983 claim does not begin to run until a plaintiff knows that she has been injured *and* "is aware or

[4] Bryant implicitly concedes that even if the clock started running on July 22, 2021, the two-year personal injury statute of limitations was tolled under O.C.G.A. § 9-3-99 for survival claims based on Mincey's pre-death pain and suffering, but Bryant asserts that the law does not toll the statute of limitations for the wrongful death claim.

should have been aware who has inflicted the injury." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987). It is undisputed that Plaintiff did not know which officers were on duty at the prison on the night of Mincey's death until April 2025 and did not know about Bryant's specific conduct until August 2025.

Bryant argues that Plaintiff is responsible for the delay in discovering this information. Based on the present record, she is not. When Plaintiff first learned of Mincey's death in 2021, a deputy warden told her that the warden would contact Plaintiff to provide more information, but he never did and instead refused to speak to Plaintiff about the particulars surrounding Mincey's death. Even after Plaintiff filed this action in 2023, GDC resisted discovery and did not provide Plaintiff with any information about the officers who were on duty at the time of Mincey's death. Due to an interlocutory appeal, discovery did not begin until December 13, 2024. GDC did not disclose identity of Bryant or the other officers who were on duty at the time of Mincey's death until April 2, 2025. The earliest Plaintiff could have known about Bryant's potential role in her brother's death, and thus the earliest date her § 1983 claim against Bryant could have accrued, was April 2, 2025. On August 15, 2025, two days after Plaintiff's counsel took Bryant's deposition and learned of her conduct, Plaintiff

sought leave to amend her complaint to add Bryant as a defendant. Within a week after Plaintiff was granted leave to add Bryant as a defendant, Plaintiff filed her amended complaint. In summary, Plaintiff was not responsible for the delay in ascertaining Bryant's identity or conduct, and she filed her amended complaint less than a year after her § 1983 claim against Bryant accrued. Accordingly, Plaintiff's § 1983 claim against Bryant is not time-barred.

**II. Jones and Mock's Motion to Dismiss**

Plaintiff alleges that Bryant's supervisors, Jones and Mock, had a practice of failing to provide adequate staffing in G Dorm, failed to provide Bryant with special training for working in G Dorm, failed to ensure that Bryant was fit for duty, and failed to supervise Bryant. But Plaintiff's Eighth Amendment § 1983 claims against Mock and Jones fail because she did not allege sufficient facts to establish supervisory liability. A supervisory official can only be held liable under § 1983 if he either personally participates in the conduct giving rise to the plaintiff's claim or if there is a causal connection between his actions and the alleged constitutional violation. *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1355 (11th Cir. 2022). "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged

deprivation, and he fails to do so." *Id.* (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). The causal connection can also be established if the supervisor's policy or custom results in deliberate indifference to constitutional rights or if the allegations suggest that the supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (quoting *Cottone*, 326 F.3d at 1360).

Here, Plaintiff did not allege that Mock or Jones personally participated in the events giving rise to this action. Instead, Plaintiff alleges that Mock and Jones did not ensure that Bryant had special training for G Dorm duties, did not evaluate Bryant to determine whether she was qualified to work in G Dorm, did not take action on Bryant's inaccurate logbook entries during two weeks in July 2021, and assigned Bryant to work G Dorm alone even though the prison's policy called for two officers in G Dorm. Plaintiff also alleges that Mock knew about Bryant's migraines and her habit of wearing sunglasses and earplugs at work. And she alleges that Mock failed to perform and log his observation rounds. But Plaintiff did not point to any factual allegations in the amended complaint (or proposed factual allegations) that Mock or Jones knew that Bryant was ill on the night that Mincey died, knew

that she was not doing her job, or routinely allowed her to skip the essential functions of her job without consequence. Plaintiff also did not point to any factual allegations establishing a history of widespread abuse that put Mock or Jones on notice of the need to correct alleged constitutional deprivations regarding inmate safety. Plaintiff does assert that Mock and Jones knew Rutledge was understaffed, but she did not allege facts to suggest that Mock or Jones knew of any constitutional violations that resulted from the understaffing. In summary, the factual allegations in the amended complaint (and the proposed second amended complaint) do not establish that Mock or Jones was subjectively aware of a specific risk of harm to Mincey or that there was a causal connection between their actions and a deprivation of Mincey's Eighth Amendment rights. Accordingly, the Court grants Defendants' motion to dismiss the § 1983 claims against Mock and Jones. The Court also denies Plaintiff's motion for leave to amend her complaint to clarify these claims because the proposed amended complaint does not cure the amended complaint's defects.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 claims against GDC, Mock, and Jones (ECF No. 66). The Court also dismisses all of Plaintiff's state law claims. The Court denies Bryant's

summary judgment motion (ECF No. 65) and Plaintiff's motion for leave to file a second amended complaint (ECF No. 68). The only remaining claim in this action is Plaintiff's § 1983 claim against Bryant.

IT IS SO ORDERED, this 3rd day of November, 2026.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA